Good morning. May it please the court, my name is Barry Paisner. I represent Johnny Fuson. I'd like to reserve three minutes for rebuttal. Thank you. Due to Mr. Fuson's health and age, he's unable to be here today. My argument has three key issues. The first one is that the hearing officer finding that Mr. Fuson was a legal resident of the Navajo partition land at the time of the passage of the Act was not based on substantial evidence and is arbitrary and capricious. The second issue is the hearing officer's alternative finding, that if Mr. Fuson wasn't a legal resident of the Navajo partition land, I'll call that the NPL, if that's all right, He was a legal resident at his ex-wife's apartment, which was provided by her employer, and that was not based on substantial evidence and was arbitrary and capricious. The third area, or third issue, is credibility. It is our position that the hearing officer's finding all Mr. Fuson's witnesses, as well as Mr. Fuson himself, not credible, was not based on substantial evidence. Johnny Fuson is a lifetime legal resident of the disputed lands, which is, before partition was called the joint use area, we now call it the former joint use area. He was a rancher, a lifetime rancher. The ranch, which was his grandfather's and his grandmother's, was the family ranch. It encompassed both the HPL, the Hopi partition land, and the Navajo partition land. They ranched it, they had sheep, they had grazing permits, and until the passage of the Act, until after the passage of the Act, the former joint use area was not partitioned. It was not fenced. So they freely went from what we now call the Hopi partition land to the Navajo partition land. So when did the Fusons diminish their herd so that they no longer had livestock on the land? When did that start? When did it end? When did it end? I am unsure when it ended, Your Honor. Can you say that they had any, without that information in the record, how can you say that they had livestock in the joint use area or in the Hopi partition area after December 1974? After 74? The tradition is the matriarch holds the grazing permit. So in 1974, Ms. Grayhair, the grandmother, the matriarch, was issued a grazing permit for I believe 370 sheep. The testimony is that Johnny grazed and herded sheep during that time period. If you look at his older brother's testimony, he says that when he went off reservation to work, it was Johnny who grazed it. So there was testimony that there was a tragic accident and Mr. Fuson's sister or aunt, his sister? His aunt. His aunt died in this accident that happened in April 1974? Yes. April 9, 1974. Okay, so early April 1974, and the partition date is December 22, 1974? That is the date of the passage of the act. The partition took place afterwards, Your Honor. So I thought that there was testimony from Mr. Fuson's niece that the family, I'm not sure what the term is when you release or diminish or call or reduce. Livestock reduction. Reduction. They reduced their herd before April 1974 and then after April 1974, but there wasn't anything that said they still had sheep by December 1974. Not that I could see. Well, I respectfully disagree, Your Honor. I think it's implicit in the record, in the transcript, that although they reduced the herd, that they were continuing to use the entire ranch for ranching, and it wasn't until September of 1975 when Johnny moved off to get a job with the Bureau of Indian Affairs in Winslow, Arizona, that the ranching ceased. But he also, if I recall this correctly, in forms that he submitted stated that he lived in Winslow from roughly 71 to 75 and didn't provide any clarification. It seemed to be that the forms that were submitted were inconsistent and a little bit confusing about where he was living and when. I agree, Your Honor. They are inconsistent. What he does say in his application is that he left the ranch, the HPL, in September of 1975 to seek employment, and that record is clear that that's from Social Security records. That is when he actually did find his first, I guess you'd call it, on the books, if you will, employment. He got married in 1971? Seventy-one, yes, ma'am. And I thought he indicated that the family had camps on the NPL and the HPL and that there were no structures on the NPL, which would tend to suggest he couldn't have lived there. He had to live on the HPL. But then later, as he was cross-examined, he acknowledged that, indeed, there were structures on the NPL and there was other testimony that substantiated there were structures on the NPL. And the family resided there. He did testify. At first, you've got to understand, Your Honor, when you're reading this, he's testifying 40 years after the fact. He was 30 years old in 1974. He's an old man 40 years later. He's a young man when it happened. He's an old man when he's testifying. He's a traditional Navajo. He's not a chatty witness. You've got to pull it out of him. He originally said, were there – and I think the broader picture is the HPL was their main home. The NPL was the summer camp where they brought the sheep to in the summer. When they said – when his own attorney said, are you sure there was nothing up on the NPL? He said, well, there was a shack. And I know you have issues with the enumeration. But the enumeration listed residences for this family in both places and listed a number of people living at HPL and NPL. Or I guess the grandmother was listed at HPL and like 13 family members at NPL, which would suggest more than like a tool shed. There was a structure at which people were residing, whether Mr. Fusen lived there or not. It seems clear that the Fusen family had some sort of structure at which they could reside on NPL. You know, my review of the enumeration shows not 13 people. I don't know where that comes from. Well, you may be correct. I may have misstated the number. It's stated in Oner's brief, Your Honor. I think that's incorrect. It lists Fanny Grayhair, the matriarch, Johnny, his wife, Ruth, and two of their children. The only person that's interviewed is the matriarch. She's the only person that's interviewed when they enumerate her on the HPL three times. She's the only person interviewed. We don't know what's in those interviews, Your Honor. It would be nice to know what's in those interviews, wouldn't it? But according to Oner, all the underlying data was lost in a flood or the dog ate their homework, whatever, and we don't have it. So I understand your point, but I don't understand the agency to be suggesting that the enumeration is dispositive. It's just one of many factors out there that the parties are looking at trying to piece together, as you've eloquently stated, a history from 40, 50 years ago with failing memories and elderly witnesses, and so there's bits of evidence out there that the parties are looking at. Something in your brief that I wanted to touch on was this issue of who has the burden of establishing whether a person qualifies for the relocation expenses because, one, they were a head of household, or two, they lived on HPL when they were, in fact, a member of the Navajo Nation or vice versa. They lived on NPL when they were a member of the Hopi tribe, so they end up having relocation because they're forced to move from one side to the other. Your brief suggests that that burden is on the government, or it's on the agency, but the CFRs clearly state that the applicant has the burden of proving where they lived and if they were a head of household, and I understand head of household is not at issue in this case. Do you still advance your sort of domicile basis for arguing that that somehow shifted the burden to the agency? I do not. Let me answer that in two ways, Your Honor. First of all, the burden is clearly on the applicant to show legal residence. However, legal residence is the equivalent of domicile. You know, the agency knows that, I know that, and the court should know that. So, as I recall, you've made this argument to this court on multiple occasions in the past, and it's never succeeded. We've never concluded that, yes, in fact, this gloss is what it means to prove what the applicant has to prove, and as I understood your argument, it was if they could prove at some point they were domiciled on HPL. In this case, it would be HPL. That means that the government then had to come forward and prove that they weren't living there at the time of the partition. Your Honor, that was our position in Daw and Shaw. And you've abandoned that now? Yes. And as you may recall, I was on both of those cases. The court has ruled that there's no burden shifting. Right. We rejected that argument twice. I what? We rejected it twice. Yeah, and I listened to the court, Your Honor. I understand that. But that doesn't throw domicile out the window. How can you throw domicile out the window? The agency has used it. So how does domicile come into play then? Because Mr. Fusen still has to prove he was a legal resident on HPL or he was domiciled on HPL. So why is this now somehow different? You're saying residents and domicile are the same. He still has the burden of showing it. The agency, you know, and I attach a memo from 1989 where they say it's equivalent. The hearing officer has used domicile criteria since 1985 to come to his decision. And what the hearing officer says in those cases is, I've said many times, you can only have one domicile. So it's our position that by the law of domicile, if Johnny Fusen shows that his domicile was his entire ranch using in a traditional customary use area, he has met his burden. I mean, the burden can't be insurmountable, Your Honor. At some point, litigants, plaintiffs and criminal defendants. It's far from insurmountable. It's very frequently established just by testimony. The records are not entirely complete. Some of there's gaps, there's lack of memory. But these claims are being processed just largely on applicants' testimony. Well, since the Herbert case, the agency, according to the report to the GAO, has rejected 95% of the applications, Your Honor. Since when? When was that case? Herbert is 2008. Okay, so that's some... 95%. Yeah, how many years is that after the act? So it's a very long time, right? So I would assume the bulk of the claims... We're talking like 40 years, 35 to 40 years after the act. So I think domicile law can be applied without the burden shifting. It has to be applied without the burden shifting because this court has said there's no burden shifting. Let me stop you for just a moment. So you've gone over time at this point, and you wanted to reserve, I believe, three minutes. I'll give you a couple minutes if you'd like to reserve that. Yeah. Okay. Okay, thank you. Good morning, Your Honors, and may it please the court. Caitlin Shugart Schmidt here on behalf of the Office of Navajo and Hopi Indian Relocation. Substantial evidence here supported the hearing officer's determination that the plaintiff did not meet his burden to show that his legal residency as of December 1974 was on Hopi partitioned land, thus qualifying him for relocation benefits. The hearing officer rationally looked at a variety of evidence available and determined that the indicators tying plaintiff either to his grandmother's NPL property or to the home of his wife and children outweighed the evidence presented by plaintiff in support of his claim of residence on the HPL. How does the hearing officer's determination that Johnny was not a legal resident of the HPL square with the deposition testimony of the BIA enumerator? I'm sorry, Your Honor, I don't quite follow your question. Repeat it. How does the hearing officer's conclusion that Johnny was not a legal resident, a resident for the purposes of relocation benefits of the HPL, how does that square with the enumeration testimony by the BIA? So my understanding of what happened here was that there was a number of visits done on the NPL and the HPL properties of Ms. Grayhair. On the NPL property, when that property was assessed by the enumerators, it was listed that Ms. Grayhair and 13 members of her family, I think we just have an incomplete portion of the enumeration record in the actual record in this case, but the full record actually included Benny, the brother, and sisters of the niece, and all the children of the brother as well, so that's where we get to the 13 people. It was a longer record. But regardless, that enumeration record specifically noted that Johnny was present on the NPL or was listed as having a residency on the NPL. The HPL enumeration doesn't have that level of detail. It simply says that Ms. Grayhair was present there. Now, this is not evidence that he did not live on the HPL, but it is evidence indicative that he lived on the NPL, and if we took his testimony as credible, what the plaintiff in this case has asserted throughout the duration was that he resided solely on the HPL. He said after repeated questioning in his testimony when he was asked, did you live anywhere else, did you live anywhere else, he repeatedly said no, he resided solely on the HPL. So even if you look at that as credible evidence, which the hearing officer found incredible, but if you looked at that and you compare it to the enumeration record, you have two conflicting pieces of evidence. You have his testimony that he resided on the NPL. How can this panel conclude that the IHO reasonably considered the relevant issues and reasonably explained its decision when it relied on the BIA's enumeration roster without addressing, and I think this goes to Judge Hawkins' question, without addressing the deposition testimony of the BIA enumerator who very explicitly stated that not all of the head of households are listed on the rosters, and that is not addressed in any way, shape, or form by the IHO in its decision. I think it's helpful to take a step back and sit at where we are in this proceeding now, which is reviewing to determine whether or not the plaintiff met his burden of proof of demonstrating his residence on the HPL. So what the hearing officer was tasked with doing was looking at everything that was presented in front of him, which was these enumeration cards, which they're very familiar with, with the hearing testimony, with his ex-wife's hearing testimony, which was found to be credible, and say, based on all of these, what do I think is a plausible outcome? What do I think was a reasonable location for his residency, and was that the HPL like he says that it was? And in this case, he's looking at that data, and he's saying, the plaintiff was clearly listed as a residence on the NPL, and here he is arguing that he lived only on the HPL. That was his testimony. Those are clearly inconsistent. So the problem is with the deposition testimony of the enumerator, she said something along the lines of they wouldn't necessarily list everyone who lived in a location. So when they list the grandmother as living at the HPL, that could be incomplete. Absolutely, yes. So Mr. Cheeson could have lived at the HPL. Yes. Okay. But he's also listed as living at the NPL. Correct. Okay. Yes. And the goal of the hearing officer sitting in this position and viewing this evidence in the first instance is not to say conclusively he did not live at the HPL, right? It isn't his job to make a determination that he absolutely did not live at the HPL or that he conclusively lived in one specific location otherwise. It's to look at the data in front of him and say, what's a reasonable conclusion from this evidence? And it's not to say that the plaintiff's claim that he lived on the HPL is impossible or that it is implausible, but merely is this a reasonable interpretation of the evidence that I have in front of me. And he's entitled to do that in the first instance because he's the one that actually sits and hears the testimony and gets the opportunity to view these proceedings as they happen. How does Johnny's case relate to the cases of Binney and Marjorie? In terms of if there's any, like this case has to go in a particular direction because of the conclusions of those cases. I mean, each case is assessed independently, and it's assessed independently because it's assessed based on the record in front of the IHO for that particular case. Did the hearing officer, here's my question, did the hearing officer use his determination as to Johnny's credibility to discount the credibility of Binney and Marjorie? The answer to that is yes, isn't it? Well, I think the hearing officer looked at hearing testimony in two ways when he was making his credibility determinations. He looked at the inconsistencies within each person's hearing testimony, and then he looked at the inconsistencies between the hearing testimonies. So, for example, if you look at Binney's testimony, I think this is in the ER at pages 428 and 429, you can see that when Binney testified, he was frequently confused about what he was testifying, or it appears that way from the transcript, although the IHO had the opportunity to actually observe him there. This was 40 or 50 years ago. Absolutely, but at the end of that testimony, what he's testifying about is actually filling out his own relocation forms, and he has no ability to discuss who filled out those forms, who assisted him in filling out those forms, whose handwriting is on those forms, and this is very near in time to the actual testimony, and he is very confused about what had happened. And it was reasonable for the hearing officer to look at that behavior, at that testimony, and say, I can't take all of this as credible because what I'm looking at in the record, and I encourage you to look at those specific pages and show how he just seems to have no real grasp of these proceedings and what's occurring, and for the hearing officer to say, that just means that I don't have confidence that this testimony is credible because it is internally inconsistent and it is contrasting and conflicting with the other testimony that I'm hearing in this proceeding that everyone was hearing together. Does the same hearing officer hear all of these cases? Yes, I believe they have from the beginning, and over, I think, approximately 3,800 cases have been approved in the years. And, of course, I think this makes sense based on the types of cases that would be brought. But the grant rate at the beginning was much higher than the grant rate is now, many years later. So it seemed that the hearing officer determined that Mr. Johnny Fuson, Mr. Benny Fuson, and Ms. Marjorie, I can't remember her last name, was Fuson. Gray hair, I think. That all three of them were not credible. Correct. And, in part, then concluded that they weren't credible because their testimony, they were inconsistent with each other. So that's some sort of circular, that you're not credible because you don't agree with something somebody who also is not credible said? How does that support the hearing officer's determination? Well, if Your Honors don't find that sort of portion of the credibility determination as convincing, I would ask you to look to this sort of first point that I made, which is the hearing officer also concluded that the testimonies themselves were inconsistent within each testimony. They talked about, for example, the plaintiff originally said repeatedly that he only lived on the HPL, that there were no structures on the NPL, and he reiterated that, and then later in his testimony, he essentially changed what his answers were and began responding in a different way. And the hearing officer could reasonably look at that and say, how can I trust someone's testimony when, even through the course of this interview, their answers to questions are changing? And that is certainly an articulate reason to find the testimony was not credible. What specific reasons did the IHO list for finding a lack of credibility as to Benny and Marjorie? Just focusing on those two. So I can grab the text of the IHO's decision, but my recollection is that he essentially said that he found it to be inconsistent and confusing, and that meant that it was not credible. Is there any obligation on the part of the IHO to go beyond that and specify? I don't think so, Your Honor. I think the standard here is pretty clear that his responsibility is just to articulate a reason for his conclusion. I think you just acknowledged a few moments ago in response to my colleague's question that it would be circular. In fact, it's problematic to determine that the testimony of any one of these witnesses is not credible simply because it's inconsistent with another witness's testimony, but that witness's testimony is also not credible. So if you acknowledge that point, which I understand that you did and, in fact, said to the court, then you should look at sort of the internal inconsistencies. Then wouldn't it be necessary for us to be able to look to the specific evidence in the record that the IHO can point to to underpin its adverse credibility finding with respect to any one of these individual witnesses? Well, I think that... So to put that a different way, sorry, because that was a long-winded way of asking the question, if we don't have anything in the record, and I don't think you have a response to the question of where specifically in the record we can look to for that, then how do we know that it wasn't based on this sort of circular reasoning that even I think you acknowledge is problematic? So I would point you directly to the IHO's decision, so this is at ER 16 and 17, and he specifically says, for example, for the plaintiff, applicant's testimony about residing at the camp is not credible in light of his family's residence and his identification by the BIA as living on the NPL. So he specifically points to that being a problem internal to the plaintiff's testimony. He then, if you turn the page, talks about Benny, and he says that Benny's testimony is confusing and conflicting and inconsistent with other witnesses, right, but that it itself was confusing and conflicting. It doesn't point to anything in particular, just generally says it's confusing and conflicting. It does, that's true, Your Honor, but you can look to the record here, you know, those pages in Benny's testimony and say, of course, someone viewing this would say, this is confusing and conflicting testimony because this particular person is not only giving inconsistent stories about his presence in this property over this time period, but he also is having more near-term issues identifying what happened in these proceedings. Did the hearing officer find an inconsistency about Johnny's testimony about silversmithing? Well, that's a tricky question, Your Honor. The question asks for a yes or no. You can explain all you want. Did he find an inconsistency based on Johnny's testimony about silversmithing? No, because Johnny never testified about silversmithing. There is absolutely nothing in the entire record from plaintiff to ever indicate that he said that he engaged in any sort of arts and crafts or silversmithing-type activity. The only place in the record there is anything about that line of argument is in his niece's testimony where she asserts that her aunt and the plaintiff engaged in that activity prior to her aunt's death on April 5, 1974. There is nothing from the plaintiff supporting any sort of traditional use, traditional silversmithing-type of activity on the NPL and HPL because he never testifies that this was a form of employment. In any case, that would be irrelevant to the question of residency, correct? If plaintiff was trying to assert that he lived both on, say, the NPL and the HPL, he was using it in sort of a customary use, traditional joint area-type manner by engaging in traditional activities, it absolutely could be relevant evidence to that question. Was that his testimony? Sorry? Was that his testimony? No, he testified that he lived on the HPL and only on the HPL and that there was no residence on the NPL and that he did not reside there. So what you're referring to is the mini-woody exception? The sort of general customary use, right, which is a way that the agency has tried to actually go further than the sort of plain text of your residence in this location and instead look to if you had someone that was traditionally moving very closely between two areas, using them as one unitary unit, you want to recognize that there's going to be a loss with removal off of part of that property, but that was not the case here based on what the hearing officer had before it. I mean, the actual evidence that he had once he made the conclusion that the plaintiff and his immediate family members whose testified testimony was not credible was the testimony of his ex-wife and the BIA enumeration data. And based on those pieces of evidence, it was reasonable for the hearing officer to look to that and say it's plausible that he lived at the NPL, it's plausible that he lived with his wife and children. Either of those, I think, are more plausible than that he lived on the HPL because there's really no evidence to support that once you take away the testimony that he found incredible. And based on that, he made a determination that plaintiff did not qualify for relocation benefits and this court should affirm that decision. Did Mr. Fusen ever say that he lived on, so his wife or his ex-wife lived on HPL or her family did? Did he ever say he lived there with her family? He, everyone agreed at the outset of this proceeding that he was not making a claim to live on her family's property at the HPL. She lived at a boarding school. She had housing there provided by her employer and that was off the HPL. That was in a different area. And if he had lived with her family on the HPL, it seems there'd be a problem that he wouldn't be the head of household on that property. I'm not sure, Your Honor, because everyone stipulated, and this is in the original testimony at the beginning of the testimony, they stipulated that he was not making any claim based on his wife's residency at her family's home. In fact, she testified that he never actually went to her family's property along with saying that she did not find him when she would come to his family's property. Okay, so we've taken you over time. Are there any other questions? Okay, thank you. Well, opposing counsel talks way faster than me, so I should get an extra minute, I think. So I think that the hearing officer's analysis is inconsistent. I think what Mr. Fuchin proved was that his family had a ranch that encompassed both the NPL and the HPL. On the determinative date, December 22, 1974, nothing changed. I mean, it was happening in Washington. It was being passed in Washington. But nothing changed out on the former joint use area. They continued using it. Yes, I agree they had reduced their flock, but that doesn't mean that they didn't have a flock. They did. And what O'Neill is focusing on- Your basis for saying they had a flock was that the grandmother had a permit for grazing in 1974. As well as Johnny, Benny, and Marjorie Grayhair's testimony that in 1974, they were living that life and herding sheep. Was it any more specific than the year 1974? Was there anything more specific with regard to their herding in 1974 other than Johnny? I mean, Johnny was in charge of it. That's what Benny said. I know, but what I'm getting at is I don't see any dates. It seemed like the reduction was taking place in 1974 and it seemed to pick up a lot of speed after the death of Mr. Fuchin's sister in April, which is several months before December. So I didn't see anything. And if there's something in the record, I'd like you to point me to it so I know it's there. Well, I mean, we're talking about April 9th and December of the same year. Eight months. I mean, nothing changed. There's no- You're just asserting that. I'm looking for record evidence, some testimony, because your client had the burden here, right, that they talked about reducing the herd and the only specific date given was this April 74 date. But no one testified that they didn't have a herd. I mean, it was that it was reduced. And everyone said that there was two reductions, 1974 and 1975, that they took in. So if they reduced in 1975, it's, you know, it's ipso facto that they had a herd in 1974. But where was the herd located in 1975? Well, nothing had changed in 1975 except the passage of the Act. And that's, you know, the enumeration shows that. The enumeration shows that they were still-they still had a home on the HPL and they still had a frame house or shack, a summer camp up on the NPL. Okay, so you see how the clock is not going up? That means you took the extra two minutes, you used those, and now you're another minute 30 over that. So can you wrap up? Are you saying I have another minute? No, I'm saying you're now almost four minutes over your allotted time. Oh, I'm sorry. I apologize. Yes, I do think that if you look at the inconsistency of the hearing officer's decision and the agency's decision, you'll see it's not based on substantial evidence. Some of it is just flat-out wrong and arbitrary and capricious, misapplication of the law. And I think Mr. Fusion is the type of Navajo relocatee who's entitled to benefits, a lifetime member there, an adult in 1974. I believe he is entitled to his benefits. I request that the court reverse and certify him as in Shaw, as was done in Shaw, for benefits because he's an elderly individual waiting for a home. Thank you. Thank you. Thank you, counsel, both for your arguments this morning. They were helpful. And that is the last case for hearing this morning, and we are adjourned.
judges: HAWKINS, BADE, DESAI